UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 15 |
| MILLENNIUM GLOBAL EMERGING CREDIT MASTER FUND LIMITED, *et al.*, | Case No. 11-13171<br>Jointly Administered |
| Debtors in Foreign Proceedings. | |

**MEMORANDUM OF DECISION
ON PETITION FOR RECOGNITION AND RELATED RELIEF**

A P P E A R A N C E S :

QUINN EMANUEL URQUHART & SULLIVAN, LLP
*Attorneys for Millennium Global Emerging Credit Master Fund Limited, et al.*
By:     Susheel Kirpalani
          Scott C. Shelley
          Robert K. Dakis
51 Madison Avenue, 22nd Floor
New York, New York 10010

BAKER & HOSTETLER LLP
*Attorneys for BCP Securities, LLC*
By:     Marc D. Powers
          Oren J. Warshavsky
          Natacha Carbajal
45 Rockefeller Plaza
New York, New York 10111

KOBRE & KIM LLP
*Attorneys for GlobeOp Financial Services, LLC*
By:     Jonathan D. Cogan
800 Third Avenue
New York, New York 10022

**ALLAN L. GROPPER
UNITED STATES BANKRUPTCY JUDGE**

# INTRODUCTION

Before the Court are chapter 15 petitions filed by the joint liquidators (the "Liquidators" or "Petitioners") of Millennium Global Emerging Credit Master Fund Limited and Millennium Global Emerging Credit Fund Limited (respectively, the "Master Fund" and "Feeder Fund" and collectively the "Funds"), seeking recognition of Bermuda liquidation proceedings as foreign main proceedings or, alternatively, foreign nonmain proceedings.[1]  The Liquidators seek recognition in order to investigate the Funds' financial affairs, conduct discovery related to potential causes of action against parties in the United States, and ultimately provide for a distribution of recovered property to creditors.  *Verified Petition of Foreign Representatives Michael W. Morrison, Charles Thresh and Richard Heis* at ¶ 38, Dkt. No. 2 ("Verified Petition").  Recognition of the Bermuda proceedings is opposed by BCP Securities, LLC ("BCP" or "the Objectant") on the ground that Bermuda is not the Funds' center of main interests ("COMI") or a place of nontransitory economic activity of the Funds.  A separate objection by GlobeOp Financial Services, LLC was withdrawn after an agreement between the parties that if recognition were granted, the automatic stay would not prevent GlobeOp from pursuing any claims it may have against the Funds outside the United States.

An evidentiary hearing regarding recognition was held on July 27, 2011, at which one of the Liquidators of the Funds, Michael Morrison, testified.  By consent, the Petitioners' case was presented by admitting into evidence the verified petitions, the declarations in support of the petitions filed by Morrison and the Funds' Bermuda counsel, Robin J. Mayor, and the Offering Memorandum for the Feeder Fund ("Offering Memorandum").  *Declaration of Robert K. Dakis,*

---

[1] A "foreign main proceeding" is defined in § 1502(4) of the Bankruptcy Code as "a foreign proceeding pending in the country where the debtor has the center of its main interests."  A "foreign nonmain proceeding" is defined in § 1502(5) as "a foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment."

*Ex. A.,* Dkt. No. 38.  BCP cross-examined Morrison and introduced the confidential information

memorandum of Millennium Global Emerging Credit Fund, L.P., a Delaware Limited

Partnership (the "Delaware Fund").  *Declaration of Marc D. Powers, Ex. 2*, Dkt. No. 16.[2]  The

facts as summarized below are based on the record and were substantially undisputed.

At the conclusion of the hearing, the Court informed the parties that it would enter an

order recognizing the Bermuda proceedings as foreign main proceedings, with a written decision

to follow.

## FACTS

The Funds were incorporated in Bermuda for the purpose of creating an offshore

investment fund that would invest in sovereign and corporate debt instruments from developing

countries.  *Declaration of Michael Morrison* ("Morrison Declaration") at ¶ 4, Dkt. No. 4.  The

Feeder Fund was incorporated in Bermuda on October 12, 2006, and the Master Fund was

incorporated in Bermuda on September 20, 2007.  *Id.* at ¶¶ 12, 19.  The Feeder Fund began

operations in December 2006 as a Bermuda Institutional Scheme under the Bermuda Investment

Funds Act of 2006.  *Id.* at ¶¶ 12-14.  The Master Fund was incorporated in order to create a

master-feeder structure that could facilitate investment from certain classes of foreign investors,

and it operated under the Bermuda Investment Funds Act as a private fund with fewer than 20

participants.  *Id.* at ¶¶ 18-20.  In fact, the Feeder Fund and the Delaware Fund were its only

participants.  At the time of the Master Fund's incorporation, the Feeder Fund transferred

substantially all its assets to it in exchange for a 97% ownership interest in the Master Fund, with

the other 3% held by the Delaware Fund, and all the service agreements of the Feeder Fund were

novated in favor of the Master Fund.  *Id.*

---

[2] The Delaware Fund was incorporated in Delaware to facilitate investments by qualified residents of the United States.  It is not a debtor in these proceedings, and the Liquidators have not been appointed and do not seek relief with respect to that entity.

The registered office of both Funds was in Bermuda at all times, at the address of their common administrator. As set forth in the Offering Memorandum, during the course of the Funds' operations they had no employees other than their three directors, Michael Collins, James Keyes, and Deborah Sebire, who each served on the boards of directors of both Funds. *Id.* at ¶¶ 15, 19. Collins and Keyes are both residents of Bermuda, and Sebire is said to be a resident of the Bailiwick of Guernsey (Channel Islands). *Id.* Both funds retained the same administrator in Bermuda, Argonaut, Limited ("Argonaut"), a Bermuda company, as well as the same bank, Butterfield Trust (Bermuda) Limited, a subsidiary of Bank of NT Butterfield & Son Ltd. ("Butterfield Bank"). *Id.* The Funds had approximately BD$900,000 on deposit at Butterfield Bank at the time of the opening of the Liquidation in 2008.[3]

The Master Fund had a "manager," Millennium Asset Management Limited (the "Manager"), responsible for "management, administration, back office activities, marketing and investment activities"; it was said to be located in Guernsey. *Offering Memorandum* at 29. The Manager in turn appointed as investment manager Millennium Global Investments Limited, which was described as London-based. *Id.* at 30. The Funds maintained prime brokerage accounts with Credit Suisse Securities (Europe) Limited and Citigroup, Inc., through which the investment manager conducted securities transactions. *Transcript of Recognition Hearing, Held on July 27, 2011*, Dkt. No. 43 at 45*; Offering Memorandum* at 58. The Funds also conducted derivative and hedging transactions under standard ISDA contracts with various counterparties. *Morrison Declaration* at ¶ 23.[4] The Offering Materials indicate that subscriptions of investors

---

[3] The Bermuda dollar is equivalent to the U.S. dollar. Any amounts set forth hereafter referring to Bermuda Dollars will be shown as simply $.

[4] Among the derivative counterparties listed in the verified petition are Banco Santander Hispano and Central SA, Barclays Bank Plc, BNP Paribas, UBS AG, Citigroup Global Markets Ltd., Citibank NA, Credit Suisse, Bayerische Hypo-und Vereinsbank AG, Morgan Stanley & Co International Plc, Standard Chartered Bank, JP Morgan Chase Bank NA, and Calyon.

would be invested in the Master Fund, which was identified as a Bermuda entity, and that the

Master Fund would set investment objectives for the Funds, exercise direct authority to oversee

the investment manager's decisions, and replace the investment manager if necessary. The

Offering Materials contain a directory that identifies the key parties involved in the management

of the Funds, including: (i) the directors, located in Bermuda and Guernsey; (ii) the manager,

located in Guernsey; (iii) the investment manager, apparently located in London; (iv) the

administrator, located in Bermuda; (v) the prime broker, apparently located in London; (vi) the

custodian, located in Bermuda; (vii) the auditors, located in Bermuda; (viii) the valuation agents,

located in the United States; (ix) the legal advisors, located in Bermuda, the United Kingdom,

and the United States; and (x) the Feeder Fund's banker, located in Bermuda. The Offering

Materials direct potential investors to direct subscription documents to the administrator in

Bermuda and cash to Butterfield Bank in Bermuda.

The liquidation of the Funds commenced as a result of their inability to meet a margin

call of the Master Fund's prime broker, Credit Suisse, on October 6, 2008. *Morrison*

*Declaration* at ¶ 25-26. A default notice was issued by Credit Suisse on October 16, 2008, and

on the same day the directors petitioned the Bermuda Court for an order directing the wind-up of

the Funds. *Id.* The Bermuda Court's order commencing the liquidation divested the directors of

all authority over the Funds and caused the appointment of Michael W. Morrison, Charles

Thresh, and Richard Heis, all of KPMG Advisory Ltd. or KPMG LLP, as provisional liquidators

with full managerial authority over the Funds. *Id.* The provisional liquidators were appointed as

joint liquidators of the Master Fund on March 5, 2009 and of the Feeder Fund on April 16, 2009.

Committees of inspection, which appear to be similar to the creditors' committee in a chapter 11 case, were formed by the Bermuda Court in both foreign proceedings. *Id.* at ¶¶ 28-30.[5]

As of the commencement of the liquidation, subscriptions to the Funds totaled $390 million, and the Liquidators estimate that as of September 30, 2008 the value of the Funds' portfolio was $738,209,753. *Id.* at ¶¶ 17, 35. However, subsequent to the closure of the prime brokerage accounts, the Funds' prime brokers asserted that there was a $170 million deficiency owed by the Funds. *Id.* Although the prime brokers ultimately asserted claims against the Funds, there was an initial return of cash totaling $21.85 million, of which $10 million was allocated to the Feeder Fund and $11.85 million to the Master Fund. *Id.* at 32. Approximately three years later, the Funds now have on hand close to $7 million held by the Feeder Fund and $7.5 million held by the Master Fund. *Id.* at 40. Morrison testified that expenses to date have been exclusively for administration of the estates, including the fees of the Liquidators and for counsel in Bermuda, the United Kingdom, and the United States, and that all expenses have been subject to oversight by the committees of inspection and the Bermuda Court.

As a consequence of the decline in value of the Funds' portfolio, the Liquidators currently have at least one litigation pending in the United Kingdom and are pursuing an investigation of potential causes of action against parties in the United States. The filing of the chapter 15 petition on June 30, 2011 was authorized by the Feeder Fund Committee and approved by the Bermuda Court on June 22, 2011, with the stated purpose to pursue discovery against parties in the United States, commence litigation if indicated, and in the meantime, if possible, obtain relief from the expiration of any statutes of limitations.

---

[5] The members of the Master Fund Committee of Inspection are the Hampshire County Council and Credit Suisse Securities (Europe) Limited. The members of the Feeder Fund Committee of Inspection are the Hampshire County Council, SG Hambros Bankers Trust (Bahamas) Limited, and Citco Global Holdings NV as custodian for entities controlled by Liongate Capital Management.

The Objectant is one of the parties that was designated by the Liquidators in the Verified Petition as potentially affected by provisional relief, admittedly as a target of the Liquidators' investigation. On cross-examination of Morrison, the Objectant established that the administration of the Funds' liquidation proceedings in Bermuda has cost approximately $9 million to date, including about $5 million spent outside of Bermuda, predominantly on fees for counsel in the United Kingdom and United States. *Transcript of Recognition Hearing* at 58. Morrison testified that the litigation that is currently pending or which may be commenced, all against parties outside of Bermuda, is likely to be the most valuable asset of the estates. *Id.* at 24-28. It was also established that: (i) the Funds' investment manager was located in London and had an exclusive contractual right to invest the Funds' portfolio; (ii) the Funds' asset valuation agent, GlobeOp, operates out of multiple locations including the United States, the United Kingdom, and India; (iii) a majority of the Funds' investors were located outside Bermuda; (iv) substantially all of the Funds' assets were invested outside of Bermuda or committed to contracts (including derivatives such as swaps) with counterparties outside of Bermuda; (v) directors' meetings were customarily held with Collins and Keyes present in Bermuda and Sebire participating by telephone from Guernsey; (vi) meetings with the Funds' service providers prior to the liquidation were frequently held by telephone or in London; (vii) meetings with creditors required by Bermuda law as part of the liquidation have routinely been held in London for the convenience of creditors; (viii) claims have been submitted in the Bermuda liquidation but only for voting purposes, with no distributions having yet occurred; and (ix) none of the members of the Funds' committees of inspection is located in Bermuda. *Id.* at 19-92. Morrison testified on redirect that all subscriptions and all requests for redemptions from the Funds were required to be directed to the Funds' administrator, Argonaut, in Bermuda,

and that the investment manager in London was subject to dismissal by the Funds' directors, located in Bermuda and Guernsey. *Id.* at 92-96.

The Objectant argued at the conclusion of the hearing that the Funds' COMI should be determined to be the United Kingdom based on the location of the investment manager, the location of many creditors and creditors' meetings, the location of the prime broker, Credit Suisse, and the fact that litigation is allegedly pending in London. The Petitioners argued that the record supported the conclusion that the Funds' COMI was in Bermuda prior to the commencement of the liquidation and had remained there or, in the alternative, had become lodged in Bermuda due to the control exercised by the Liquidators there and the fact that creditors look to the Bermuda proceedings for recoveries. Alternatively, the Petitioners argued that the Funds had an "establishment" in Bermuda and the foreign proceedings are entitled to recognition as foreign nonmain proceedings.

## DISCUSSION

The principal issue in dispute with respect to this application for recognition under chapter 15 of the Bankruptcy Code is whether the Funds have their "center of main interests" or an "establishment" in Bermuda, entitling the Liquidators to recognition of the foreign proceedings as "foreign main" or "foreign nonmain" proceedings. BCP contends that the Bermuda liquidation proceedings in question, which have been pending in Bermuda for more than three years without any apparent objection by creditors or others affected by the proceedings and which have cost more than $9 million in fees and expenses, are not entitled to recognition as either main or nonmain proceedings because Bermuda is not the "center of main interests" of either of the Funds and because they did not have an "establishment" in Bermuda, as required for nonmain recognition. If BCP is correct and the Bermuda proceedings are not

recognized, the Liquidators may be unable to access the U.S. courts to investigate and prosecute

possible claims against BCP and others, or they might have to start a new proceeding in some

putative "center of main interests" and incur all the costs of duplicative liquidation proceedings.

Chapter 15 of the Bankruptcy Code which is designed to foster cooperation with foreign

proceedings, not to thwart them, does not mandate this result.

<u>Main and Nonmain Recognition: "Center of Main Interests" and "Establishment"</u>

The requirement that a court determine the COMI of the debtor in a foreign proceeding is

an integral element of the recognition procedures adopted as part of chapter 15, the U.S. version

of the Model Law on Cross-Border Insolvency ("Model Law") drafted by the United Nations

Commission on International Trade Law (UNCITRAL).[6]  Among other things, chapter 15 allows

the representative of a foreign insolvency estate to file a petition in the U.S. bankruptcy court and

seek an order of recognition, after which certain relief may come into effect automatically and

additional relief can be granted by the court.  As relevant to this proceeding, the foreign

representatives seek an order of recognition, and they have also made it clear that if a recognition

order is entered, they will seek discovery from U.S. entities, including BCP, to investigate

possible claims.[7]

Chapter 15 contemplates a short and relatively simple petition for recognition,

accompanied by proof of the existence of the foreign proceeding, and it specifically avoids

giving the court the degree of discretion at the outset of a case that was required under former

---

[6] U.N. Sales No. E.99V.3 (1999) (as published with Guide to Enactment), *available at* http://www.uncitral.org /pdf/english/texts/insolven/insolvency-e.pdf.  Chapter 15 was adopted, effective October 17, 2005, replacing § 304 of the Bankruptcy Code, which was repealed.  The Model Law is the product of efforts to harmonize the law of international insolvency and has been adopted by approximately 18 nations, in addition to the United States.  The United States adopted the Model Law with very few changes.

[7] A further issue relating to the relief sought by the Liquidators concerns the application of § 108 of the Bankruptcy Code.  That issue is dealt with below.  The right to obtain a discovery order after recognition is afforded by § 1521(a)(4).  The Liquidators initially sought preliminary relief of an emergency nature under § 1519, but that was denied.

§ 304, where the court had to consider issues such as "comity" and the interests of creditors in the United States before an order was entered.[8]  In the words of one decision, chapter 15 imposes a fairly rigid procedural structure for recognition of a foreign proceeding but then affords the court "substantial discretion and flexibility" in fashioning relief.[9]  The UNCITRAL Guide to Enactment further explains, "[I]f recognition is not contrary to the public policy of the enacting State and if the application meets the requirements set out in the article, recognition will be granted as a matter of course."[10]

Notwithstanding the goal of a simplified procedure for obtaining an order of recognition, the process has been complicated by the introduction into the Model Law and chapter 15 of the COMI concept.  The court is directed to recognize the foreign proceeding "(1) as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests; or (2) as a foreign nonmain proceeding if the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending," 11 U.S.C. § 1517(b).  "Establishment" is defined in § 1502(2) as "any place of operations where the debtor carries out a nontransitory economic activity."  The statute does not expressly deal with a proceeding from a foreign country that satisfies neither of these requirements, *i.e.*, a proceeding that is not or was not the debtor's "center of main interests" or a place where the debtor has or had an "establishment."  *Id.*  BCP draws the implication that in such circumstances the foreign

---

[8] *See In re Treco,* 240 F.3d 148, 154 (2d Cir. 2001).
[9] *In re Bear Stearns High Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 126 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008), *citing* Jay Lawrence Westbrook, *Locating the Eye of the Financial Storm*, 32 Brook. J. Int'l L. 1019, 1024 (2007) (hereinafter "*Locating the Eye*").
[10] Guide to Enactment, ¶ 124.  The Guide's reference to public policy is to a provision that in the United States is codified as § 1506, providing for a court to deny relief in a chapter 15 case if "the action would be manifestly contrary to the public policy of the United States."  This is a very narrow exception.  *In re Toft*, No. 11-11049 (ALG), 2011 WL 3023544 at *5 (Bankr. S.D.N.Y. July 22, 2011).  BCP raised the argument that recognition of the Bermuda proceeding would be "manifestly contrary to the public policy of the United States" in its objection papers, but its counsel asked for an opportunity to reconsider the argument and inform the Court if it wished to renew its objection on that basis.  *Transcript of Recognition Hearing* at 116.  It has not done so, and there is no contention in this case that proceedings in "outlier" or "tax haven" jurisdictions should be denied recognition as a matter of public policy under § 1506.

representative is completely shut out of the U.S. judicial system and can obtain no substantive relief whatsoever.[11]

Neither the Model Law nor chapter 15 defines the term "COMI." Article 16(3) of the Model Law provides that, "In the absence of proof to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the center of the debtor's main interests." The U.S. adopted the principle in § 1516(c), which is identical but uses the phrase, "in the absence of evidence to the contrary."[12] An insolvency proceeding from the debtor's COMI is designated the main proceeding, and any other case filed in a nation where the debtor has an "establishment" is designated as a nonmain proceeding.

These deceptively simple terms have engendered considerable litigation. Although most cases have not involved a COMI issue,[13] disputes to date have included: the COMI of an enterprise that moved to the United States;[14] the COMI of a company doing business in Australia, Canada, and the United States via the internet;[15] the COMI of a fraudulent enterprise;[16] the COMI of a businessman who claimed "there is no legal regime covering [his] commercial activities";[17] and the COMI of a businessman who moved to the United States before the filing of the chapter 15 petition.[18] More relevant to the instant case, there are multiple cases, further

---

[11] See further discussion below at n. 42.

[12] The legislative history explains that the wording was changed "to make it clearer using United States terminology that the ultimate burden [of proof] is on the foreign representative." H.R. Rep. No. 109-31 at 112-13 (2005). One court has stated that this creates a rebuttable presumption for purposes of U.S. evidentiary principles. *In re Tri-Continental Exchange Ltd.*, 349 B.R. 627, 634-35 (Bankr. E.D. Cal. 2006).

[13] *See* Jay Lawrence Westbrook, *The Model Law in the United States: COMI and Groups* (2010), *available at* http://www.iiiglobal.org/component/jdownloads/?task=view.download&cid=3882 (last accessed Aug. 19, 2011).

[14] *In re Gold & Honey, Ltd.*, 410 B.R. 357 (Bankr. E.D.N.Y. 2009).

[15] *In re Betcorp Ltd.*, 400 B.R. 266 (Bankr. D. Nev. 2009).

[16] *Tri-Continental*, 349 B.R. 627.

[17] *In re Chiang*, 437 B.R. 397, 403 (Bankr. C.D. Cal. 2010).

[18] *Lavie v. Ran (In re Ran)*, 607 F.3d 1017, 1019 (5th Cir. 2010). *See also Williams v. Simpson*, HC HAM CIV 2010-419-1174 [Oct. 12, 2010] (N.Z.), *at* http://jdo.justice.govt.nz/jdo/GetJudgment/?judgmentID=179987 (last accessed Aug 19, 2011) (COMI of a retired psychiatrist who moved to New Zealand).

discussed below, regarding the recognition (if any) to be afforded to insolvency proceedings brought by offshore funds like these debtors.

In determining the COMI of these Funds or the existence of an "establishment," it is necessary to separate two issues: (i) the appropriate date at which to make the determination; and (ii) the factors to be considered in making the determination. We start with the question of the date at which the determination should be made.

<u>The Date at Which to Determine COMI or the Existence of an Establishment</u>

As the Liquidators point out, the few cases on point (both business and individual) have determined the COMI of an entity and whether an establishment exists as of the date of the filing of the chapter 15 petition. *See In re Ran*, 607 F.3d 1017, 1025 (5th Cir. 2010) (individual); *In re Betcorp Ltd.*, 400 B.R. 266, 290-92 (Bankr. D. Nev. 2009) (business); *In re British American Ins. Co. Ltd.*, 425 B.R. 884, 909-11 (Bankr. S.D. Fla. 2010) (business); *In re Fairfield Sentry, Ltd.,* 440 B.R. 60 (Bankr. S.D.N.Y. 2010) (business). In *In re Ran*, for example, the Court started its analysis with §1502(4), which provides that a "foreign main proceeding means a foreign proceeding pending in the country where the debtor has the center of its main interests." The Court continued, "While § 1502 does not expressly discuss a temporal framework for determining COMI, the grammatical tense in which it is written provides guidance to the court. Every operative verb is written in the present tense. Congress's choice to use the present tense requires courts to view the COMI determination in the present, *i.e.* at the time the petition for recognition was filed." 607 F.3d at 1025. It continued by asserting that use of any other date in the past would create a serious chance of conflict with the decisions of other courts:

> In fact, a meandering and never-ending inquiry into a debtor's past interests could lead to a denial of recognition in a country where a debtor's interests are truly centered, merely because he conducted past activities in a country at some point well before the petition for recognition was sought.

*Id.* Similar language and approach is set forth in the *Betcorp* decision, on which *Ran* relies. *In re Ran*, 607 F.3d. at 1026.[19]

Notwithstanding the authority in support of using the chapter 15 filing date as the date for making a COMI determination, use of the chapter 15 petition date is not required by the "plain words" of the statute and produces a result wholly inconsistent therewith. Starting with the words of the statute, the cases stress that § 1502 speaks in the present tense, as it does. *See In re Ran*, 607 F.3d at 1025-26; *In re Betcorp*, 400 B.R. at 291-92. However, the courts do not explain why they assume that the statute refers to the filing of the chapter 15 petition rather than the filing of the petition in the case for which recognition is sought. In a chapter 15 filing, the U.S. case is ancillary or secondary to the foreign proceeding. 11 U.S.C. § 1504; *see In re Toft*, No. 11-11049, 2011 WL 3023544 at *4 (Bankr. S.D.N.Y. July 22, 2011).[20] The date of the petition for recognition is a matter of happenstance; in this case, for example, the chapter 15 filing took place three years after the filing of the liquidation in Bermuda, apparently occasioned by the possible passage of one or more statutes of limitation on causes of action of the estates. The substantive date for the determination of the COMI issue is at the date of the opening of the foreign proceeding for which recognition is sought.

---

[19] *Betcorp* in turn relied on a lower court decision in *Ran*. 400 B.R. at 290-91, *citing In re Ran,* 390 B.R. 257, 264 n. 3 (Bankr. S.D. Tex. 2008).

[20] See also the chapter 15 legislative history, stating that there is a "United States policy in favor of a general rule that countries other than the home country of the debtor, where a main proceeding would be brought, should usually act through ancillary proceedings in aid of the main proceedings. . . ." H.R. Rep. 109-31, Pt. 1, 107-108 (2005) (commentary relating to § 1504).

This construction is clear if one simply translates the arcane term "center of main interests" into plain English. The Court observed in *In re Tri-Continental Exchange Ltd.*, 349 B.R. 627, 634 (Bankr. E.D. Cal. 2006), that the term center of main interests "generally equates with the concept of 'principal place of business' in United States law." The decision quotes the explanation of Professor Westbrook, one of the drafters of the UNCITRAL Model Law and chapter 15, as to why the term "center of main interests" was substituted:

> Chapter 15 was drafted to follow the Model Law as closely as possible, with the idea of encouraging other countries to do the same. One example is use of the phrase "center of main interests," which could have been replaced by "principal place of business" as a phrase more familiar to American judges and lawyers. The drafters of Chapter 15 believed, however, that such a crucial jurisdictional test should be uniform . . . .

*Tri-Continental*, 349 B.R. at 633, *quoting* Jay Lawrence Westbrook, *Chapter 15 at Last*, 79 Am. Bankr. L. J. 713, 719–20 (2005).[21] Other courts have similarly used "center of main interests" and "principal place of business" interchangeably. *See In re Basis Yield Alpha Fund (Master)*, 381 B.R. 37, 48 (Bankr. S.D.N.Y. 2008); *In re Betcorp,* 400 B.R. at 287-88.

If the term "principal place of business" is substituted for "center of main interests," it is obvious that the date for determining an entity's place of business refers to the business of the entity before it was placed into liquidation. A debtor does not continue to have a principal place of business after liquidation is ordered and the business stops operating. As the Court recognized in *Fairfield Sentry*, as a result of the opening of liquidation proceedings, "the Debtors have no place of business, no management . . . ." 440 B.R. at 64. Although a debtor in a reorganization case may continue to have a principal place of business, this is the place of business of the reorganizing entity, not the debtor. In any event, a liquidating company, like the debtors in the

---

[21] *See also* Jay Lawrence Westbrook, *Locating the Eye, supra* n. 9, at 1020 ("COMI is similar to standards like 'principal place of business,' 'chief executive office,' or 'real seat' that one finds in many statutes in the United States and elsewhere.").

case at bar, does not have a principal place of business, and the drafters of the Model Law would not have employed the term with a reorganization case in mind because reorganization is rare in most countries outside the United States.[22]

Prior to the adoption of chapter 15, the Bankruptcy Code required the Court to consider the "principal place of business" or "principal assets" of a debtor in determining whether to recognize a foreign proceeding under § 304. The concept appeared in the definition of "foreign proceeding" in § 101(23), which, prior to the adoption of chapter 15, defined "foreign proceeding" to mean:

> a proceeding . . . in a foreign country in which the debtor's . . . principal place of business or principal assets were located at the commencement of the proceeding, but which is convened for the purpose of liquidation or debt adjustment . . . or reorganization.

11 U.S.C. § 101(23) (1990) (amended by Pub. Law No. 109-8 (2005)). Section 101(23) thus made it clear that the determination as to "principal place of business" was to be made as of "the commencement of the proceeding," *i.e.*, the foreign proceeding. The Model Law simplified and shortened the definition and distinguished between "main" and "nonmain" proceedings, but there is no indication in chapter 15 or the legislative history that Congress intended to change the prior bankruptcy practice of looking to the date on which foreign proceedings were first commenced.[23]

The Model Law is explained in a Guide to Enactment, also drafted by UNCITRAL and intended for the use of countries considering adoption of the Model Law. There is no substantive analysis of the COMI concept in the UNCITRAL Guide to Enactment, merely an observation that the term "corresponds to the formulation in article 3 of the European Union

---

[22] Christoph G. Paulus, *Global Insolvency Law and the Role of Multinational Institutions*, 32 Brook. J. Int'l L. 755, n.18 (2006-2007); Terence C. Halliday, *Legitimacy, Technology, and Leverage: The Building Blocks of Insolvency Architecture in the Decade Past and the Decade Ahead*, 32 Brook. J. Int'l L. 1081, 1094 (2007); UNCITRAL Legislative Guide on Insolvency Law, U.N. Pub. Sales. No. E.05.V.10 (2005), *available at* http://www.uncitral.org/pdf/english/texts/insolven/05-80722_Ebook.pdf (last accessed Aug. 19, 2011).

[23] There is no legislative history on the issue. Mark Lightner, *Determining the Center of Main Interests Under Chapter 15*, 18 J. Bankr. L. & Prac. 5, n. 76 (2009).

Convention on Insolvency Proceedings, thus building on the emerging harmonization as regards the notion of a 'main' proceeding."[24] In fact, the COMI concept and the terms "center of main interests" and "establishment" were both imported into the Model Law from the European Insolvency Regulation ("EU Regulation"), which requires members of the European Union to recognize and give effect to insolvency proceedings commenced in other nations of the Union.[25] The EU Regulation does not contemplate the commencement of a separate ancillary proceeding to seek recognition of a foreign insolvency case, as in the Model Law and chapter 15, as the members of the Union are automatically required to recognize foreign proceedings from the date of their opening. The date of the opening of initial insolvency proceeding is the only date that the original drafters of the term for the EU Regulation could have contemplated.[26]

---

[24] Model Law, Guide to Enactment at ¶ 31.

[25] Article 3 of the EU Regulation provides, "The courts of the Member State within the territory of which the centre of a debtor's main interests is situated shall have jurisdiction to open insolvency proceedings." European Insolvency Regulation, Council Reg. (EC) No. 1346/2000 of 29 May 2000 at Art. 3, ¶ 1. *See MG Probud Gdynia, sp.zo.o*, 2010 ECJ EUR-Lex LEXIS 15 (Jan. 21, 2010) (requiring recognition of a Polish insolvency proceeding in Germany). The EU Regulation has been adopted by all of the members of the European Union except Denmark. The "Convention" referred to in the passage from the UNCITRAL Guide to Enactment quoted above was a predecessor version of the EU Regulation.

[26] The *Betcorp* decision recognizes that the English cases interpreting the EU Regulation "seem to select a time linked to the commencement or service of the relevant insolvency proceeding." 400 B.R. at 292, citing *inter alia Re Collins & Aikman Corp. Group*, [2005] EWCH (Ch) 1754, ¶ 39, 2005 WL 4829623. The *Betcorp* decision then asserts that this is the date that corresponds to the date on which the chapter 15 case commenced. In fact, the corresponding date is the date of the opening of the first insolvency case in the European Union, which would equate not to the chapter 15 petition date but to the date of the opening of the case for which recognition is sought. This is clear from several cases decided since *Collins & Aikman*, in which the English courts have elaborated on the construction of the term "centre of main interests." In *In re Stanford Int'l Bank, Ltd. (In Receivership)*, [2010] EWCA Civ. 137, 3 W.L.R. 941, 2010 WL 605796 (Ct. of Appeal 2010), the Chancellor said that the term COMI should be given the same interpretation in the English version of the UNCITRAL Model Law and in the EU Regulation (¶ 54), but he implicitly rejected the argument that a COMI should be determined on the basis of activities subsequent to the failure of a business enterprise, observing that the debtor's "interests main or otherwise ceased on discovery of the alleged fraudulent scheme . . . ." (¶ 56(4)). In *Shierson v. Vlieland-Boddy*, [2005] EWCA Civ. 974, [2005] W.L.R. 3966 (2005), the issue before the Court of Appeal in a case under the EU Regulation was "how ready should the court be to accept that the debtor is free to change his centre of main interest between the time at which credit is extended and the opening of insolvency proceedings." (¶ 38). Lord Chadwick said that COMI should be "determined at the time that the court is required to decide whether to open insolvency proceedings." (¶ 55). The opinion of Lord Longmore said that "it is not beyond the realm of argument that the correct date is the date of service of the bankruptcy petition on the debtor rather than the date of the hearing of the petition" (¶ 71), but he did not suggest it was any later. *See also* Mark Lightner, *Determining the Center of Main Interests Under Chapter 15*, 18 Norton J. Bankr. L. & Practice 519, 529 (2009) (recognizing that the EU Regulation requires a COMI determination as of the date of the opening of insolvency proceedings).

Similarly, the drafters of the EU Regulation had the date of opening of insolvency proceedings in mind when they coined the term "establishment." It is important to note that in the EU Regulation the requirement of an "establishment" is a limitation on the right of any creditor or other entity to open an insolvency proceeding regarding a debtor. Since the EU Regulation does not prevent the opening of an insolvency case in one nation merely because a case is pending in another EU jurisdiction (including at the COMI), the requirement that there be an establishment constitutes a prohibition on the opening of a proceeding in a jurisdiction where the debtor was not "established." EU Regulation, Art. 3(2). Thus, in the European Union, there cannot be an anomaly such as the Objectant proposes in the instant case – a proceeding that has lasted for three years but is not entitled to any recognition. In the European context, a case can only be opened in a jurisdiction where the debtor has an establishment.

Both the *Ran* and *Betcorp* cases argue that it would be bad policy to establish a date prior to the chapter 15 filing as the relevant date for determining COMI, asserting that "a meandering and never-ending inquiry into the debtor's past interests could lead to a denial of recognition. . . ." *In re Ran*, 607 F.3d at 1025; *see also In re Betcorp*, 400 B.R. at 291-92. They shoot down this straw-man, and there is no contention here that COMI should be determined on the basis of some indeterminate date "in the past." However, reference to the commencement date of the insolvency proceeding for which recognition is sought does not invite a "meandering" inquiry. It is consistent with the "plain words of the statute" and would seemingly avoid the result of cases such as *In re Ran*, in which the COMI concept was applied in a manner which resulted in denial of any hearing in the United States for an individual debtor's foreign creditors.[27] The COMI inquiry need not be construed by courts in a manner that allows it to be

---

[27] *In re Ran* involved an individual who had amassed debts in Israel, moved to the United States and established residence in Texas. Since an individual was involved, the key part of the COMI definition was the debtor's "habitual

used as a shield against foreign creditors, especially as that would be at odds with the stated purpose of chapter 15, "to promote cooperation with foreign proceedings."[28]

Use of chapter 15 petition date as the date for determining recognition also leads to the possibility of forum shopping, as it gives *prima facie* recognition to a change of residence between the date of opening proceedings in the foreign nation and the chapter 15 petition date. The *Ran* court considered this issue and found that the there was a failure of proof that the individual debtor there had absconded. It pointedly said, "A similar case brought immediately after the party's arrival in the United States following a long period of domicile in the county [country] where the bankruptcy is pending would likely lead to a different result." 607 F.3d at 1026. It did not explain how this "different result" could obtain in view of its rigid construction of the "plain words" of the statute, or how long a period of domicile would suffice.

As the facts of the *Ran* case bear out, the construction of the term COMI that avoids the use of chapter 15 as a shield by absconding debtors looks to the time period on or about the commencement of the foreign case whose recognition is sought. In *Ran*, if the liquidator were guilty of laches – and it appears that 10 years passed before he sought an order of recognition in the United States – he might be denied substantive relief, a result that is entirely consistent with chapter 15, which requires that the interests of the debtor as well as creditors be "sufficiently

residence," rather than "principal place of business," and the facts demonstrated that Ran had moved to Texas many years before the chapter 15 case was filed. Using the date of the filing of the chapter 15 petition as the determinative date, the Court concluded that the use of the present tense in the definition of COMI required it to find that Ran's COMI was in Texas. As a consequence, it would appear that the foreign estate representatives were barred from obtaining any relief before any court in the United States, no matter what the nature of Ran's derelictions in Israel. Chapter 15, which was designed to foster cooperation with foreign proceedings, was applied so as to bar any cross-border recognition. For a case similar to *Ran*, see *Williams v. Simpson*, HC HAM CIV 2010-419-1174 [October 12, 2010] (N.Z.), *available at* http://jdo.justice.govt.nz/jdo/GetJudgment/?judgmentID=179987. In *Williams v. Simpson*, however, the New Zealand Court was able to recognize the English proceeding under § 426 of the Insolvency Act 1986, which authorizes the recognition of insolvency decrees from a "relevant jurisdiction" (ordinarily a member of the Commonwealth). Otherwise, the result might have been to prevent an English estate administrator from any relief in New Zealand and possibly to allow the debtor, who had apparently moved from England to New Zealand, to retain some or all of the millions of dollars in gold that was found buried in his basement.

[28] 11 U.S.C. § 1501(a)(1); *see In re Atlas Shipping A/S,* 404 B.R. 726, 738 (Bankr. S.D.N.Y. 2009).

protected."  11 U.S.C. § 1522(a).  In any event, the "plain words" of the statute do not require

that a foreign representative in a case like *Ran* be denied any relief by use of the chapter 15

petition date.  The appropriate date at which to determine COMI is on or about the date of the

commencement of the foreign proceeding for which recognition is sought.  The same date should

be used to determine whether the foreign debtor has an "establishment" in the foreign nation.

We therefore turn to the following questions: (i) the COMI of these debtors as of the date of the

commencement of the liquidation in Bermuda in 2008; and (ii) whether they had an

"establishment" in Bermuda at that time.

The Debtors' COMI at the Commencement of the Liquidation in Bermuda

To determine the COMI of the Funds at the commencement of the liquidation in 2008, it

is necessary, once again, to consider the "plain words of the statute."  The term COMI is not

defined in either the Model Law or in chapter 15.  Section 1516, entitled "Presumptions

concerning recognition," provides in subsection (c) that, "In the absence of evidence to the

contrary, the debtor's registered office, or habitual residence in the case of an individual, is

presumed to be the center of the debtor's main interests."  This establishes a rebuttable

presumption that the COMI is at the debtor's registered office.  *Tri-Continental*, 349 B.R. at 635;

*In re Betcorp,* 400 B.R. at 285.  Rule 301 of the Federal Rules of Evidence, which governs the

standard for rebuttal of statutory presumptions, provides:

> In all civil actions and proceedings not otherwise provided for by
> Act of Congress or by these rules, a presumption imposes on the
> party against whom it is directed the burden of going forward with
> evidence to rebut or meet the presumption, but does not shift to
> such party the burden of proof in the sense of the risk of
> nonpersuasion, which remains throughout the trial upon the party
> on whom it was originally cast.

Fed. R. Evid. 301.  "Courts and commentators are in general agreement that proffered evidence is 'sufficient' to rebut a presumption as long as the evidence could support a reasonable jury finding of 'the nonexistence of the presumed fact.'"  *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 149 (2d Cir. 2007).  The party seeking to rebut a statutory presumption must present "enough evidence . . . to withstand a motion for summary judgment. . . ."  *McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 288 (3d Cir. 2006).

In determining the COMI of a foreign debtor, cases have examined a number of factors, including:

> the location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.

*In re SPhinX*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006), *aff'd* 371 B.R. 10 (S.D.N.Y. 2007); *see also In re Bear Stearns*, 374 B.R. at 128, *aff'd*, with this language quoted by the District Court, 389 B.R. at 336; *In re Loy*, 380 B.R. 154, 162 (Bankr. E.D.Va. 2007); *In re Betcorp*, 400 B.R. at 286; *In re Ernst & Young, Inc.*, 383 B.R. 773, 779 (Bankr. D. Colo. 2008).  Many of the COMI cases also emphasize that the COMI should be "ascertainable by third parties."  *In re Betcorp,* 400 B.R. at 291; *Bear Stearns* 374 B.R. at 129; *In re Basis Yield Alpha Fund (Master)*, 381 B.R. at 47.  As explained in the *Betcorp* decision, the language emphasizing that the COMI should be "ascertainable by third parties" comes from ¶ 13 of the EU Regulation, the first major legislation to employ the terms "COMI" and "establishment."  *In re Betcorp*, 400 B.R. at 286.[29]

---

[29] ¶ 13 of the EU Regulation provides, "The 'centre of main interests' should correspond to the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties." In its principal decision construing the EU Regulation, *Bondi v. Bank of Am. N.A.* (*In re Eurofood IFSC Ltd.),* Case 341/04, 2006 E.C.R. I-3813, 2006 ECG Celex Lexis 777, 2006 WL 1142304 (E.C.J. May 2, 2006), the European Court of Justice held that a financing subsidiary of the Italian conglomerate Parmalat, registered in Ireland, had its

In this case, many of the factors that the courts have used in the COMI determination point toward Bermuda, and others point in various directions. Starting with those that point toward Bermuda, two of the Funds' three directors were located in Bermuda, and the directors had the right to replace all of the Funds' other agents, as well as the right to determine whether to place the Funds into an insolvency proceeding. Bermuda was also the location of the Funds' bank, their custodian, and their auditors. On the other hand, the day-to-day management of the Funds' investments did not take place in Bermuda. As the Offering Memorandum disclosed, the directors appointed as manager for the Funds an entity described as "Millennium Asset Management Limited, a Guernsey company." The manager had "responsibility for the Fund's management, administration, back-office activities, marketing and investment activities, all of which are subject to the overall control of the Directors." The Offering Memorandum further disclosed that the "manager" had appointed as "investment manager" a "London-based investment management company regulated by the Financial Services Authority of the United Kingdom" and also "registered with the SEC as an investment advisor." There is no evidence that any of the Funds' investors or other creditors resided in Bermuda, and the Funds did not invest in property in Bermuda.

A simple tally of the foregoing factors demonstrates that more point toward Bermuda than elsewhere. On the record of this case, this supports the finding that the COMI was Bermuda. In addition, there are two further reasons for finding that the Funds' COMI was in Bermuda as of the date of the wind-up order.

---

COMI in Ireland despite the fact that it was controlled from Italy. The Court held that the presumption that the COMI is at the place of the debtor's registered office "can be rebutted only if factors which are both *objective and ascertainable by third parties* enable it to be established that an actual situation exists which is different from that which location at the registered office is deemed to reflect." ¶ 34-35 (emphasis added). *See also* Samuel L. Bufford, *Center of Main Interest, Int'l Insolvency Case Venue, and Equality of Arms: The* Eurofood *Decision of the European Court of Justice*, 27 Nw. J. Int'l L. & Bus. 351 (Winter 2007).

Most important, in the case at bar, the only center of main interests reasonably "ascertainable by third parties" was Bermuda. The Offering Memorandum for the Feeder Fund offered shares in "A Bermuda Exempted Company (Mutual Fund), classified as an Institutional Fund under the Investment Funds Act 2006 of Bermuda." The Offering Memorandum made it clear that the Funds were located in Bermuda and subject to the control of a Bermuda-based board of directors, and all investors were directed to send their cash to an account in Bermuda. The Funds' investors did not invest in a London hedge fund; they invested in an offshore fund, and if the daily investment decisions were made by a London-based adviser, the investment manager was subject to the ultimate control of the directors of the Funds. An investor could speculate as to the location of the manager (Guernsey, elsewhere?), and investors were informed that the investment manager was "London-based." Nevertheless, Bermuda was the only jurisdiction clearly identified with the Funds, and on this record it was the only jurisdiction reasonably "ascertainable by third parties."[30]

Moreover, because the formation of the funds in Bermuda was clearly disclosed in the Offering Memorandum, investors could have reasonably expected that Bermuda was likely to be the venue of any proceeding to wind up or liquidate the Funds. Under Bermuda law, a Bermuda company is subject to being wound up, voluntarily or involuntarily, in a proceeding in Bermuda.[31] It would have been pure speculation that the Funds would be liquidated or wound up in any other jurisdiction. One of the authors of the Model Law and of chapter 15 has suggested that the COMI determination should be affected by the likelihood that the COMI jurisdiction

_____

[30] At closing argument of the hearing on the recognition motion, counsel for the Objectant candidly admitted, in response to a question from the Court as where he would place the Funds' COMI, that he had not been certain before the hearing where it was (except that it was not in Bermuda), but that after the hearing he thought it was in the United Kingdom. *Transcript of Recognition Hearing* at 110. It is submitted that the U.K. could not have been reasonably ascertainable as the debtors' COMI if it took a hearing in court, the testimony of two witnesses and multiple documents before counsel for the Objectant could even specify the U.K. as the alleged COMI.
[31] Bermuda Companies Act 1981, Part XIII; *see* Dianna P. Kempe, *Foreign and Multinational Business Insolvency in Bermuda*, 1997 Ann. Surv. Bankr. L. 26 (1997).

would have an acceptable substantive law.[32]  Although there are decisions that rigidly assert that

equitable factors should play no role at the recognition phase of a chapter 15 case,[33] it would

seem that a determination relative to recognition and to the "center of main interests" of an

enterprise should take into account the existence of a fair and impartial judicial system and a

sophisticated body of law, as aspects of the *bona fides* of the proceedings.[34]  It bears noting,

therefore, that Bermuda has a sophisticated, fair and impartial legal system that has been

recognized and granted comity by our courts.  *See, e.g., In re Board of Directors of Hopewell*

*Int'l Ins. Ltd.*, 275 B.R. 699 (S.D.N.Y. 2002), *aff'g.* 238 B.R. 25 (Bankr. S.D.N.Y. 1999) (after

8-day trial and searching inquiry into Bermuda law and insolvency procedures, Bankruptcy

Court recognized Bermuda insolvency proceeding and injunction issued by the Bermuda court;

order affirmed by District Court).[35]

　　　　In addition to the fact that Bermuda was the only COMI reasonably ascertainable by third

parties, there is insufficient evidence in this case that establishes the COMI in a location other

than Bermuda.  There was a manager, ostensibly in Guernsey, but even the Objectant does not

contend that the Funds' COMI was Guernsey.  The Funds' investment manager was said to be

---

[32] Westbrook, *Locating the Eye*, *supra*, n. 9 at 1020, cited in *In re Betcorp,* 400 B.R. at 290, n. 16.

[33] *In re Loy*, 380 B.R. 154, 168 (E.D. Va. 2007);  *In re Ran*, 406 B.R. 277, 288 (S.D. Tex. 2009), *aff'd on other grounds*, 607 F.3d 1017 (5th Cir. 2010).

[34] The absence of a fair and impartial judicial system in a given jurisdiction would presumably result in a denial of recognition under § 1506 of chapter 15, which provides that "Nothing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States."  *See In re Toft*, No. 11-11049 (ALG), 2011 WL 3023544 (Bankr. S.D.N.Y. July 22, 2011). Cases prior to the adoption of chapter 15 also denied recognition where the purpose of the foreign case was "to defeat the [U.S.] bankruptcy proceeding – strategic conduct that is not to be encouraged."  *Underwood v. Hilliard (In re Rimsat)*, 98 F.3d 956 (7th Cir. 1996) (pre-chapter 15 case; denial of recognition to receivership proceeding in Nevis); *In re SPhinX, Ltd.*, 371 B.R. 10, 18 (S.D.N.Y. 2007), *aff'g* 351 B.R. 103 (Bankr. S.D.N.Y. 2006) (recognition sought "for an improper purpose," *i.e.*, to defeat a settlement collaterally).

[35] The Objectant argued that most of the derivative contracts entered into on behalf of the Funds were made in London.  It may be that these contracts were governed by English law (the record does not show), but it does not follow that English law would apply to most disputes or that it could not be applied by the courts of Bermuda, a British overseas territory.  To the extent that the Offering Memorandum disclosed anything about a governing law, its discussion of "Legal Risks" in the section entitled "Certain Risk Factors" is primarily focused on the risks of obtaining legal redress in the third-world countries in which it was contemplated that the Fund's investments would be concentrated.  It was disclosed, however, that "it may be difficult to obtain and enforce a judgment in a court outside of Bermuda."

"London-based," but there is very little evidence of record as to where the investment manager actually was located; as a practical matter an investment manager can be anywhere he or she has access to a computer terminal to make a trade and to follow the market.[36]  The Funds' assets were securities issued in "emerging countries," probably represented by book entries in ledgers throughout the world.  The location of the prime broker for the Funds, identified as Credit Suisse Securities (Europe) Limited, was disclosed in at least some of the offering materials as London, but testimony indicated that Citigroup, Inc. was also used as a prime broker, suggesting that at least some of the Funds' investments were subject to control from New York.  Furthermore, there is evidence that the location of the prime broker could vary; a footnote in the Offering Memorandum states, "To the extent that assets of the Master Fund are treated as 'plan assets' under ERISA, the prime broker will be located in the United States."  The record does not disclose where the Funds' investors were located, except that some were in the United Kingdom, some were in the United States, and some were themselves located in offshore jurisdictions.  The evidence did disclose that post-liquidation meetings have been held in London for the convenience of creditors, but there is no evidence that the Funds' creditors were closely identified with any one jurisdiction.

On this record, the proof does not establish an alternative COMI.  Since every entity has a center of main interests, *In re Chiang*, 437 B.R. at 403, the fact that the evidence does not disclose a COMI other than Bermuda operates in favor of granting recognition of the Bermuda proceedings as foreign main proceedings.

The Objectant relies heavily on *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 128 (Bankr S.D.N.Y. 2007), *aff'd*, 389 B.R. 325

---

[36] Four principals of the investment manager are identified, one of whom is identified as "Swiss and British," one as British, and two without a stated nationality.

(S.D.N.Y. 2008) (hereinafter "*Bear Stearns*").  In that case the issue of recognition was not contested; nevertheless, the Court found that the burden of proof as to recognition as a main or nonmain proceeding remained on the foreign representatives and that the "rebuttable presumption" in § 1516(c) that the place of the entity's registered office is its COMI "at no time relieves a petitioner of its burden of non-persuasion on the issue."[37]  The Bankruptcy Court ultimately concluded, based on the record that the liquidators had presented in support of the petition, that the hedge fund's operations were controlled entirely from New York, that it had no personnel or business in the Caymans other than a letterbox, and that its COMI was at the New York headquarters of Bear Stearns.  The decision was affirmed by the District Court, and it has been followed by several other courts, some of which have placed an increasingly heavy burden on the foreign representative to establish COMI, whether or not there was any opposition to recognition.[38]

The *Bear Stearns* facts can be distinguished from those of the instant case.  In *Bear Stearns*, the fund had no presence in the Caymans other than a letterbox; in this case, the Funds have extensive contacts with Bermuda.  In *Bear Stearns*, representatives of a feeder fund operating out of the United States appeared and supported denial of the petition, on the theory that there needed to be an investigation of the U.S. fund, which would be impeded by proceedings in the Caymans.  There are no such allegations in this case, and the only objection

---

[37] *Bear Stearns (District Court, aff'g)*, 389 B.R. at 335.

[38] *See Reserve Int'l Liquidity Fund Ltd. v. Caxton Int'l Ltd.*, No. 09 Civ. 9021 (PGG), 2010 WL 1779282 (S.D.N.Y. April 29, 2010) (court in an interpleader action in New York refused to defer to a competing BVI liquidation on several grounds, including that the debtor's COMI was in the United States and the foreign liquidation would not be recognized in a chapter 15 recognition proceeding); *In re British Am. Ins. Co.*, 425 B.R. 884 (Bankr. S.D. Fla. 2010) (court recognized judicial managers appointed in St. Vincent and the Grenadines because the insurance company did business there but refused to recognize judicial managers from the Bahamas because the company's relationship with the Bahamas was based exclusively on its registration there).  In *In re Basis Yield Alpha Fund (Master)*, 381 B.R. 37, there was no objection to recognition of a Cayman proceeding, but the Bankruptcy Court denied summary judgment to the foreign representatives on the authority of *Bear Stearns*, adding to the record a set of interrogatories that the foreign representative would have to answer before a final decision on recognition could be made.  In the instant case the Debtors provided the Objectant with answers to these same interrogatories, but the questions and answers were not put in the record.

comes from the target of proposed discovery.  In *Bear Stearns*, it was possible to determine an

alternative COMI because the fund there was wholly identified with and controlled by a

brokerage firm located in New York, whose name it bore.  In the cases at bar, there is no

jurisdiction other than Bermuda that can be fairly construed as the center of main interests.

In any event, the policy concerns that apparently drove the decision in *Bear Stearns* are

not present in this case.  Recognition of these Bermuda proceedings would be consistent with the

principal purpose of establishing a COMI requirement – to provide a basis for centralizing

insolvency proceedings relating to an enterprise in one forum.[39]  The drafters of the Model Law

hoped that identification of a "center of main interests" would point toward a single forum in

which proceedings could be centralized or would at least foster a cooperative spirit and increase

the likelihood of reorganization or sale of an enterprise as a whole, with its worldwide assets

intact, rather than piecemeal dismemberment and the likelihood of liquidation on a national

basis.[40]  These goals would be impeded, rather than fostered, by a construction of chapter 15 that

would exclude the Funds from obtaining recognition in the United States.  This is underscored by

the fact that refusal to recognize the foreign proceedings on either a main or nonmain basis

would deny all recognition to a liquidation that has proceeded for years at an expense of millions

of dollars, seemingly with the support of creditors.  The apparent result would be to deny the

Liquidators access to any judicial relief in the United States, or if they could not obtain nonmain

recognition, compel them to start another proceeding in some putative third jurisdiction in the

---

[39] Jay Lawrence Westbrook, *A Global Solution to Multinational Default*, 98 Mich. L. Rev. 2276, 2279 (2000); *Locating the Eye, supra* n. 9, at 1019; *see also Cambridge Gas Trans. Corp. v. Official Comm. of Unsecured Creditors of Navigator Holdings Plc*, [2007] 1 A.C. 508, [2006] W.L.R. 689, [2006] UKPC 26, 2006 WL 1546603, where Lord Hoffmann observed, "The  English common law has traditionally taken the view that fairness between creditors requires that ideally, bankruptcy proceedings should have universal application."
[40] The hope for cooperation is probably the reason for the oblique reference to "the emerging harmonization" as regards the notion of a main proceeding referred to in ¶ 31 of the Guide to Enactment.

hope that a U.S. court, years in the future, might deem that place the COMI and grant an order of recognition.

Indeed, it is relevant that those courts and commentators who have advocated denial of main recognition to cases from tax havens have assumed that the foreign representative would not be shut out of the U.S. judicial system altogether.[41] Yet the developing case law is to the contrary. Section 1509(b) provides that if the bankruptcy court grants recognition, the foreign representative may sue and be sued "in a court in the United States." Section 1511(a) similarly provides that "upon recognition," a foreign representative may commence a voluntary case, if the foreign proceeding is a foreign main proceeding, or an involuntary case. The clear implication of failure to obtain any recognition, borne out by the case law, is that without an order of recognition the foreign representative cannot be heard in any court in the United States.[42] Any exclusionary rule would be contrary to U.S. interests. For example, denial of any recognition to

---

[41] For example, in *Bear Stearns*, although the Court cited contrary authority, it assumed that the foreign representative could bring an involuntary plenary case in the U.S. against the debtor under § 303(b)(4) and that non-recognition of the foreign proceeding would not leave the foreign representative there without the ability to obtain some relief in the U.S. courts. 374 B.R. at 132. One of the authors of the Model Law and a leading commentator on cross-border issues has written that the adoption of chapter 15 and the COMI requirement "will reverse a ruling of importance, *In re National Warranty Ins. Risk Retention Group* [384 F.3d 959 (8th Cir. 2004)]." Jay Lawrence Westbrook, *Chapter 15 at Last*, at 727 (2005). "Under § 1502(4) of Chapter 15, by contrast, the COMI of a company like National Warranty would be clearly located in Nebraska and thus the Caymans liquidation could not be its main proceeding." *Id.* On the other hand, Prof. Westbrook assumes that *National Warranty* would have been entitled to nonmain recognition. *See Chapter 15 at Last*, 79 Am. Bankr. L.J. at 728. In another paper he criticizes the reasoning of the decision of the Bankruptcy Court in *In re SPhinX*, 351 B.R. 103 (Bankr. S.D.N.Y. 2006), *aff'd* 371 B.R. 10 (S.D.N.Y. 2007), but assumes that the court there could have accorded the foreign representative nonmain recognition, as it did. 32 Brook. J. Int'l L. at 1025. The possibility that the Funds could be granted nonmain recognition in this case is dealt with below.

[42] *See Reserve Int'l Fund v. Caxton*, No. 09 Civ. 9021, 2010 WL 1779282 at *5 (S.D.N.Y. Apr. 29, 2010); *Andrus v. Digital Fairway Corp*, No. 3:08-CV-199-O, 2009 WL 1849981 (N.D. Tex. June 26, 2009); *United States v. J.A. Jones Constr. Group, LLC*, 333 B.R. 637 (E.D.N.Y. 2005). The legislative history contains the same implication, stating that "chapter 15 is intended to be the exclusive door to ancillary assistance to foreign proceedings." H.R. Rep. No. 109-31 at 110 (2005). There is an exception that provides that an unrecognized foreign representative can "sue in a court in the United States to collect or recover a claim which is property of the debtor" but this is a narrow exception. *Reserve Int'l Fund* at *15. One commentator has suggested that in addition to main and nonmain proceedings, there is a third category covering non-recognized foreign proceedings, so-called "tertiary proceedings." *See* Samuel L. Bufford, United States International Insolvency Law § 1.7 (Oxford Univ. Press 2009). No court has yet endorsed this concept. Moreover, § 1509(d) provides that "If the court denies recognition under this chapter, the court may issue any appropriate order necessary to prevent the foreign representative from obtaining comity or cooperation from courts in the United States." Nothing in the statute provides the reverse, that if recognition is denied, the court can still permit the foreign representative to appear and be heard.

the Liquidators here would appear to deny them access to our judicial system and possibly prevent them from pursuing legitimate claims against third parties. This would disadvantage U.S. creditors who claim in the Bermuda proceedings.

It has been suggested that laxity in the application of the COMI principle or in recognition of cases from tax havens would encourage companies to register and then file in an "outlier" jurisdiction whose law is unduly favorable to debtors and disadvantageous to creditor interests.[43] Hedge or mutual funds such as these foreign debtors are not holding companies of major enterprises located elsewhere attempting to justify a filing in Bermuda. In any event, a court has ample power to protect creditors in recognized chapter 15 cases. For example, recognition of a case as a foreign main proceeding does not require that the COMI's law be applied to a specific dispute. *See In re Maxwell Comm'n Corp.*, 93 F.3d 1036 (2d Cir. 1996).[44] All relief that automatically goes into effect after main recognition can be modified or vacated. Under chapter 15 the court is required to ascertain that the interests of U.S. creditors are "sufficiently protected" before it grants any discretionary relief, particularly if it entrusts the distribution of assets to the foreign representative, and the court is also empowered to effectuate other procedures for the protection of U.S. creditors, such as the appointment of an examiner. 11 U.S.C. §§ 1522, 1521(b).[45] Moreover, although multiple proceedings should be the exception,

---

[43] Jay Lawrence Westbrook, *Locating the Eye, supra* n. 9, at 1031.
[44] In *Reserve Int'l v. Caxton*, 2010 WL 1779282 at *14, the U.S. court relied on *Bear Stearns* and assumed that a BVI representative could not obtain recognition under chapter 15 and thus could not appear in the interpleader case before him. The Court's substantive concern, however, appears to be a ruling of the BVI court on a critical point of law issued without any notice to U.S. creditors whose rights could be vitally affected. It is suggested that the decision of the BVI court could have been disregarded for lack of due process or otherwise, even if the foreign proceeding had been recognized.
[45] *Tri-Continental*, 349 B.R. at 636; *In re Int'l Banking Corp. B.S.C.,* 439 B.R. 614 (Bankr. S.D.N.Y. 2010); *In re Loy*, 380 B.R. at 166-68.

U.S. creditors are not precluded from filing an involuntary plenary proceeding against the debtor in the United States if there is an adequate showing of a need for additional protection.[46]

Finally, the COMI requirement should not be applied in a manner that would effectively establish a presumption *against* recognition of cases from offshore jurisdictions. Such a presumption would set the text of the statute on its head and construe chapter 15 to reverse a line of cases under the predecessor provision, § 304, that recognized proceedings from the Caribbean.[47] The text of chapter 15 and its legislative history do not expressly disavow this authority, and the COMI requirement can be faithfully applied consistently with it. *See Dewsnup v. Timm*, 502 U.S. 410, 419 (1992) ("When Congress amends the bankruptcy laws, it does not write 'on a clean slate' . . . . This Court has been reluctant to accept arguments that would interpret the Code . . . to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history."); *Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 562 (1990) ("We will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure.").

---

[46] 11 U.S.C. § 1520(c); *see In re Tradex Swiss AG*, 384 B.R. 34 (Bankr. D. Mass. 2008) (Swiss proceeding recognized as nonmain proceeding but involuntary case filed by U.S. creditors not dismissed); *In re RHTC Liquidating Co.*, 424 B.R. 714 (Bankr. W.D. Pa. 2010) (motion to dismiss U.S. involuntary case denied despite prior recognition of Canadian proceeding as foreign main proceeding).

[47] An influential early case under § 304 was *In re Culmer*, where the Court recognized a proceeding filed in the Bahamas by an offshore subsidiary of the notorious Banco Ambrosiano, and remitted assets for distribution in the proceeding there on the ground that the liquidation was fair and entitled to comity. *In re Culmer (Banco Ambrosiano Overseas Limited)*, 25 B.R. 621 (Bankr.S.D.N.Y.1982) (coining the phrase that § 304 permitted the court to fashion relief in "near blank-check fashion."). Later cases recognized proceedings filed in other Caribbean jurisdictions. *In re Commodore Int'l Ltd.*, 262 F.3d 96 (2d Cir. 2001); *In re Nat'l Warranty Ins. Risk Retention Group (Bullmore)*, 384 F.3d 959 (8th Cir. 2004); *In re Gee*, 53 B.R. 891 (Bankr. S.D.N.Y. 1985); *In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*, 275 B.R. 699 (S.D.N.Y. 2002). In *Treco*, 240 F.3d 148, the Second Circuit refused to remit assets to a court in the Bahamas if the transfer would adversely affect the interests of a creditor who held a valid security interest under U.S. law. The Court expressed concern about the cost of the foreign proceeding, but it did not question the integrity of that proceeding. 240 F.3d at 156. One of the first reported cases under chapter 15 also recognized a proceeding from St. Vincent and the Grenadines as a foreign main proceeding because, although the debtor ran a fraudulent operation, the fraud had been perpetrated from a base in the Caribbean nation and its COMI was there. *Tri-Continental*, 349 B.R. 627. The U.S. courts expressed no concern about the professionalism of the liquidation proceedings in the foreign jurisdictions.

In conclusion, based on the record, assuming that the evidence is sufficient to rebut the § 1516(c) presumption, the Liquidators satisfied their burden of establishing that the COMI of the Funds was in Bermuda as of the commencement of the liquidation in 2008. The foreign proceedings are entitled to recognition as foreign main proceedings.

The Presence of an "Establishment" in Bermuda at the Commencement of the Liquidation

Similarly, even if the Funds did not have their COMI in Bermuda at the outset of the liquidation there and were not entitled to "main" recognition, the Funds would be entitled to recognition as foreign nonmain proceedings. As noted above, a foreign nonmain proceeding is defined as a foreign proceeding "pending in a country where the debtor has an establishment." 11 U.S.C. § 1502(5). Establishment is defined as "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502(2). The definition is a slightly shorter version of the definition in the Model Law, which adds, at the end, the words, "with human means and goods or services." Model Law, Art. 2(f). There is no substantive analysis of the term "establishment" in the Model Law Guide to Enactment, only a statement that the term was "inspired by" the EU Convention. Guide to Enactment ¶ 75.

There is relatively little U.S. authority construing the term "establishment" as it is used in chapter 15. In *Bear Stearns*, 374 B.R. at 128, the Bankruptcy Court denied nonmain recognition to a company registered in the Cayman Islands that appears to have had nothing more than a letterbox there. It did not have any business or even any cash in the Cayman Islands at the time the fund was placed in liquidation. The Court held that there was insufficient economic activity in the Cayman Islands to find an establishment, noting that the presence of assets alone would not justify such a finding. 374 B.R. at 131, n. 12.[48] In *In re Ran*, the businessman had moved

_____

[48] This holding was affirmed without substantive discussion. 389 B.R. 325, 334 (S.D.N.Y. 2008). In *In re SPhinX*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006), *aff'd* 371 B.R. 10 (S.D.N.Y. 2007), the Court granted nonmain

from Israel to Texas and had no remaining business in Israel when the chapter 15 petition was filed, and the Court held he did not have an establishment in Israel at that time. 607 F.3d 1017.

Notwithstanding the paucity of U.S. authority, there are U.K. cases that have construed the same term "establishment" as used in the U.K. version of the Model Law and the EU Regulation.[49] The English courts have found that the presence of an asset together with minimal management of the asset can constitute an "establishment." In *Shierson v. Vlieland-Boddy*, [2005] EWCA Civ. 974, [2005] W.L.R. 3966 (2005) (hereinafter "*Shierson*"), the individual debtor had moved from England to Spain a substantial period of time prior to the opening of insolvency proceedings. However, there was evidence that the corporate owner of certain property that he had mortgaged while resident in England was his nominee, and that he managed the property individually or through an agent. The Court concluded that nonmain proceedings could be opened against him.

In the *Shierson* case, the English judges relied heavily on a report by Miguel Virgos and Etienne Schmit on a draft "European Convention on Insolvency" (the "Virgos-Schmit Report") that was a predecessor of the EU Regulation and that first used the terms "center of main interests" and "establishment."[50] In the Virgos-Schmit Report, the term establishment is explained as follows:

---

recognition and thus assumed there was an establishment in the Caymans but (as the *Bear Stearns* decisions note) without any analysis. *See Bear Stearns,* 374 B.R. at 131, 389 B.R. at 334.

[49] Interpretation of the EU Regulation is persuasive because the English courts have held that the same terms in the EU Regulation and the Model Law should be given the same construction. *In re Stanford Int'l Bank, Ltd. (In Receivership)*, [2010] EWCA Civ. 137, 3 W.L.R. 941, 2010 WL 605796, ¶ 54 (Ct. of Appeal 2010). We are instructed that in interpreting chapter 15, "the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508.

[50] Miguel Virgos & Etienne Schmit, *Report on the Convention on Insolvency Proceedings*, ¶ 75, *available at* http://globalinsolvency.com/articles/virgos-schmit-report-convention-insolvency-proceedings-now-re. The Report is viewed as persuasive with regard to interpretation of the EU Regulation. *Shierson* at ¶ 47. The EU definition of establishment is identical to that in the Model Law and the Model Law as adopted in the United Kingdom.

"[E]stablishment" is understood to mean a place of operations through which the debtor carries out an economic activity on a non-transitory basis, and where he uses human resources and goods . . . A purely occasional place of operations cannot be classified as an "establishment." A certain stability is required.

*Virgos-Schmit Report* at ¶ 71. The report places emphasis on several factors that contribute to identifying an establishment: the economic impact of the debtor's operations on the market, the maintenance of a "minimum level of organization" for a period of time, and the objective appearance to creditors whether the debtor has a local presence. *Id.* In the *Shierson* case, the judges accepted the analysis in the Virgos-Schmit Report, finding that an establishment means economic activities carried out with "a minimum level of organization. A purely occasional place of operations cannot be classified as an 'establishment.' A certain stability is required." *Shierson* at ¶ 66. On the other hand, the judges held that there is no minimum period for such activity, as "the negative formula ('non-transitory') aims to avoid minimum time requirements." *Id.* As noted above, evidence of some management of an asset through a nominee was sufficient to constitute an establishment.

Based on available authority and giving the operative words of the statute their fair meaning, the Funds carried out nontransitory economic activity sufficient to constitute an "establishment" in Bermuda, entitling their Liquidators to recognition of the Bermuda proceedings as nonmain proceedings. In contrast to the Fund in *Bear Stearns*, where the only cash migrated to the Caymans after the liquidation proceedings were opened, the Funds accepted and processed investors' cash deposits in Bermuda, kept some or all of their books of account in Bermuda, and were subject to the control of directors, a majority of whom were located in Bermuda. Examining the factors in the Virgos-Schmit Report, the Funds maintained a "minimum level of organization" in Bermuda – registered offices and a local board of directors –

in a manner that was stable and apparent to third-parties, as disclosed in the Offering Memorandum. There is no question that the Funds' investment activities were controlled from outside Bermuda, but to deem the services of the investment manager as controlling would improperly consolidate the Funds with a third party that is not in an insolvency proceeding. Moreover, the location of a professional advisor such as an investment manager – who could be hired or fired at the discretion of the Funds' directors – should not override what on an objective analysis was the Funds' maintenance of a local presence. Since the term "nontransitory" is used in the sense of having stability rather than being constant and ongoing, and since there is no minimum time period required, the front-end costs incurred in setting up a fund, including fees paid to retain local counsel and commitment of capital to local banks, should also be considered "economic activities" of a fund, so long as the actions are taken in good faith.

Obviously, before a court grants a foreign proceeding nonmain recognition, it must be satisfied that the main proceeding is – or ought to be – in another known location. In this case, the Court is convinced that the Funds' COMI was in Bermuda. However, assuming *arguendo* that it was not, and that the Funds are not entitled to main recognition, they had an "establishment" in Bermuda at the time the liquidation was opened there and would be entitled to nonmain recognition.

COMI and "Establishment" Determined as of the Date of the Chapter 15 Petition

Even if the date for determining a foreign debtor's COMI and the existence of an "establishment" were not the date of the opening of the proceedings for which recognition is sought, and if the contrary authority cited above is followed, the Funds' COMI is Bermuda. Several recent decisions have analyzed COMI as of the date of the petition for recognition and concluded that COMI can be premised on liquidation activities. In *In re Fairfield Sentry Ltd.*,

440 B.R. 60, 64 (Bankr. S.D.N.Y. 2010), the Court held that the center of main interests of a hedge fund was at its place of registry in the British Virgin Islands ("BVI") because that was the location of its liquidation. The Court found that:

> [T]he Debtors effectively ceased doing business more than 18 months before their Petition and 7 months before the BVI Liquidation Proceedings commenced . . . the Debtors' activities for an extended period of time have been conducted only in connection with winding up the Debtors' business. Under these circumstances, it is appropriate for the Court to consider this extended period in determining COMI. The Court finds that the facts now extant provide a sufficient basis for finding that the Debtors' COMI for the purpose of recognition as a main proceeding is in the BVI, and not elsewhere.

*Fairfield Sentry*, 440 B.R. at 64; *see also, In re British Am. Isle of Venice (BVI), Ltd.,* 441 B.R. 713, 723 (S.D. Fla. 2010) (COMI in BVI based on numerous factors, including location of insolvency proceedings); *In re British Am. Ins. Co.,* 425 B.R. 884, 914 (Bankr. S.D. Fla. 2010) (COMI may "become lodged with the foreign representative where a foreign representative remains in place for an extended period, and relocates all of the primary business activities of the debtor to his location (or brings business to a halt), thereby causing creditors and other parties to look to the [foreign representative] as the location of a debtor's business.").

Accepting this approach, and determining COMI as of the date of the petition for recognition, the center of main interests of the Funds would still be Bermuda, where they have been in liquidation and under the control of the Liquidators since 2008. Assuming *arguendo* that the Funds had "interests" on the date the chapter 15 petition was filed, they would consist of the process of collecting assets, closing out contracts, and (hopefully) paying creditors as well as the Liquidators and their counsel. BCP made an effort to show at the hearing that some of the activities in connection with the liquidation have taken place outside of Bermuda. For example, of the $9 million spent to date on the administration of the insolvency cases, only about $4

million has been paid to the Liquidators in Bermuda and much of the remainder to counsel in the United Kingdom, who have been pursuing contract rights in that jurisdiction. The *Fairfield Sentry* Court properly rejected the proposition that the location of "contingent and disputed litigation claims" could form the basis for a COMI determination. 440 B.R. at 65. In any event, in this case, counsel are controlled by their clients located in Bermuda, and the Liquidators in turn are subject to the control of the court there.[51]

In conclusion, assuming that the date for determining whether the foreign proceedings should be recognized as main cases is the date of the filing of the chapter 15 petition, the Funds' center of main interests is Bermuda.

## CONCLUSION

Based on the foregoing, the Liquidators are entitled to an order recognizing the foreign proceedings as foreign main proceedings. Alternatively, the foreign proceedings would be entitled to recognition as foreign nonmain proceedings. In addition, the Liquidators seek an order of the Court confirming that § 108 of the Bankruptcy Code applies in this chapter 15 case. Section 108 provides for an extension of certain limitation periods if the period has not expired under applicable nonbankruptcy law before the date of the filing of the petition.

Section 103(a) of the Bankruptcy Code provides that chapter 1 (which includes § 108) applies in a case under chapter 15, and § 101(42) of the Bankruptcy Code, as amended in 2010, provides that the term "petition" includes a petition filed under chapter 15. Section 1521(a)(7) further provides that the court may grant a foreign representative in a chapter 15 case any additional relief in a case available to a trustee appointed under other chapters of the Bankruptcy Code (with exceptions not relevant here). Construing the clear language of the statute, the Court

---

[51] In *In re Ernst & Young, Inc.*, 383 B.R. 773, 781 (Bankr. D. Colo. 2008), the Court observed, "Costs of liquidation are a reality, whether through a foreign proceeding, or through a United States bankruptcy case." It found unpersuasive the argument that a decision on recognition should be based on the situs of litigation costs.

in a second *Fairfield Sentry* decision found that a foreign representative in a chapter 15 case was entitled to the extensions of the time periods provided for in § 108. *See In re Fairfield Sentry*, No. 10-13164 (BRL), 2011 WL 1998376 at *6 (Bankr. S.D.N.Y. May 23, 2011). The thorough and convincing analysis in that case is adopted here. The foreign representatives are entitled to confirmation as to the availability of § 108 relief in this chapter 15 case.[52]

The Liquidators are directed to settle an order consistent with this decision.

Dated: New York, New York
      August 26, 2011

                               */s/ Allan L. Gropper*
                               UNITED STATES BANKRUPTCY JUDGE

---

[52] There is no concern in this case, as there was in *In re Bancredit Cayman Ltd. (In Liquidation)*, 2008 U.S. Dist. LEXIS 30596 (S.D.N.Y. March 31, 2008), *aff'g*, 2007 Bankr. Lexis 3805 (Bankr. S.D.N.Y. 2007), that a determination as to the applicability of § 108 would be made without notice to parties against whom it was directed. The foreign representatives provided notice to the parties against whom they seek an extension of time of their intention to seek an order from this Court regarding § 108, and BCP opposed this as well as the other branches of the Liquidators' motion.